## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ )<br><br>**MAQUET CARDIOVASCULAR LLC,**  )<br>  )<br>  **Plaintiff/Counterdefendant,**  )<br>  )<br>  **v.**  )<br>  )<br>**ABIOMED, INC., ABIOMED R&D, INC.,**  )<br>**and ABIOMED EUROPE GMBH,**  )<br>  )<br>  **Defendants/Counterclaimants,** )<br>_____ ) | **Civil Action No.**<br>**17-12311-FDS** |

## MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION

**SAYLOR, C.J.**

This is an action for patent infringement.  This is the second lawsuit between the parties concerning the same technology.  *See Abiomed, Inc. v. Maquet Cardiovascular LLC*, No. 16-cv-10914-FDS (D. Mass.) ("*Abiomed I*").

Plaintiff Maquet Cardiovascular LLC has sued defendants Abiomed, Inc., Abiomed R&D, Inc., and Abiomed Europe GmbH for infringing U.S. Patent No. 10,238,783 (filed Sept. 21, 2018) ("the '783 patent").  Defendants (collectively, "Abiomed") counterclaimed for declaratory judgment of noninfringement.

The parties have submitted proposed claim construction of nine terms or groups of terms. The construction of the disputed terms are set forth below.

## I.    Background

### A.    Parties

Plaintiff Maquet Cardiovascular LLC is the owner by assignment of several patents relating to intravascular blood pumps.  As relevant here, Maquet is the owner of the '783 patent,

which is at issue in this case.  (Am. Compl. ¶ 1).

Defendant Abiomed manufactures, markets, distributes, and sells medical devices, including the Impella line of intravascular blood pumps, which have been on the market since June 2008.  (*Id.* ¶¶ 2, 13).

### B.  Underlying Technology

The '783 patent is a descendant of earlier patents held by Maquet that disclose guidance systems for intravascular blood pumps.  For the convenience of the reader, the Court will recap its summary of the underlying technology from *Abiomed I*.  (*See Abiomed I*, Docket No. 241 ("*Abiomed I* Mem. & Order on Claim Constr.") at 1-4).  Nevertheless, the Court will briefly survey ground previously covered.

Intravascular blood pumps are essentially miniature pumps that are inserted through a patient's vasculature to provide blood-pumping support to diseased or damaged hearts, and are used "(1) for acute support during cardio-pulmonary operations; (2) for short-term support while awaiting recovery of the heart from surgery; or (3) as a bridge to keep a patient alive while awaiting heart transplantation."  (*See* '783 patent, col. 1 ll. 37-44).  The pumps are capable of being introduced into the vasculature percutaneously in a remote location of the body and then guided into the heart.  (*See id.*, col. 1 l. 64 to col. 2 l. 19).

Generally, the blood pump systems discussed by the patent and the parties have the following basic structure:  At the far end of the system is a cannula (designated 14 below), a small tube through which blood is drawn into the pump.  Attached to the cannula is the blood pump itself (12), which includes a rotor, and is housed within a protective shroud.  Extending from the back of the pump is a variable assembly (18), sometimes called a catheter, that can house the drive cable for the blood pump and various guide mechanisms.



FIG. 1

('783 patent, fig.1).

One of the central problems in developing such pumps is that they are "difficult to guide into the appropriate position within the circulatory system of a patient." (*Id.*, col. 2 ll. 22-25). Prior art blood pumps used supplemental guide mechanisms, such as guide catheters, that enlarged the diameter of the device and consumed valuable space within the blood vessel, thereby restricting the available space for blood flow and increasing the size of the wound needed to introduce the device into the patient's circulatory system. (*See id.*, col. 2 ll. 45-55). The '783 patent (as well as the ancestor patents) claims to improve upon the prior art by developing blood pumps with integrated guide mechanisms that facilitate the guidance of the blood pump throughout the vasculature while eliminating the need for supplemental guide

3

mechanisms that augment the diameter of the device.  *(See id.*, col. 2 l. 62 to col. 3 l. 3).

The patent describes three examples of such integrated guide mechanisms.  The first is an "over-the-wire" guide mechanism, in which "a central lumen is formed through at least a portion of the intravascular blood pump system such that a guide element, such as a guide wire, may be progressed therethrough and advanced to the predetermined location in the circulatory system of the patient." (*Id.*, col. 3 ll. 10-14).  Thus, in an "over-the-wire" design, the lumen is situated within the cannula so that the guidewire can be advanced through the device to the desired location within the circulatory system.  The blood pump is then advanced along the guide element to that location.  (*See id.*, col. 3 ll. 4-17).

The second example of an integrated guide mechanism is a "side-rigger" or "rapid exchange" type guide mechanism, in which "a side lumen is formed along a length of at least one of the intravascular blood pump and the cannula" through which a "guide element, such as a guide wire, may be advanced to the predetermined location in the circulatory system of the patient." (*Id.*, col. 3 ll. 25-29).  As with the "over-the-wire" design, the pump is then advanced along the guide element.  (*See id.*, col. 3 ll. 29-32).

The third example of an integrated guide mechanism is an "intravascular blood pump system" including a "conduit assembly" with a "guide catheter" and a "pump assembly," such that the conduit assembly is "precisely and efficiently guided into a desired position within the body through the use of conventional guiding techniques well known in interventional cardiology." (*Id.*, col. 3 ll. 34-53).  "The pump assembly may thereafter be introduced into and guided within the conduit until the pump assembly is docked within the rotor shroud." (*Id.*, col. 3 ll. 54-56).

4

### C.       Procedural Posture

During *Abiomed I*, the PTO issued U.S. Patent No. 9,789,238 ("the '238 patent"), which was a descendant of the patents at issue in that case.  Maquet sought to add allegations of infringement of the '238 patent, but Abiomed objected, so Maquet agreed to assert those claims in a separate lawsuit.  Maquet then filed this action.

On March 26, 2019, the PTO issued the '783 patent, which is a divisional of the '238 patent.  Maquet thereafter amended the complaint in this case to add allegations of infringement of the '783 patent.  The suit has since been narrowed such that only claims of infringement of the more recently issued '783 patent are at issue.

## II.    Standard of Review

The construction of claim terms is a question of law, which may in some cases rely on underlying factual determinations.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 835, 837-38 (2015); *see Markman v. Westview Instruments*, 517 U.S. 370, 372 (1996) ("[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court.").

In *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*), the Federal Circuit clarified the proper approach to claim construction and set forth principles for determining the hierarchy and weight of the definitional sources that give a patent its meaning.  The guiding principle of construction is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of . . . the effective filing date of the patent application."  *Id.* at 1313.  Courts thus seek clarification of meaning in "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art."  *Id.* at

1314 (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

A.     **The Words of the Claim**

The claim-construction analysis normally begins with the claims themselves.[1]  The claims of a patent "define the invention to which the patentee is entitled the right to exclude." *Phillips*, 415 F.3d at 1312 (citing *Innova*, 381 F.3d at 1115).

A court may construe a claim term to have its plain meaning when such a construction resolves a dispute between the parties.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008); *see also U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, . . . [but] is not an obligatory exercise in redundancy.").

In some instances, the arrangement of the disputed term in the claims is dispositive. "This court's cases provide numerous . . . examples in which the use of a term within the claim provides a firm basis for construing the term."  *Phillips*, 415 F.3d at 1314.  For example, because claim terms are normally used consistently throughout the patent, the meaning of a term in one claim is likely the meaning of that same term in another.  *Id.*  In addition, "the presence of a

---

[1] In *Phillips*, the Federal Circuit discredited the practice of starting the claim construction analysis with broad definitions found in dictionaries and other extrinsic sources:

> [I]f the district court starts with the broad dictionary definition . . . and fails to fully appreciate how the specification implicitly limits that definition, the error will systematically cause the construction of the claim to be unduly expansive.  The risk of systematic overbreadth is greatly reduced if the court instead focuses at the outset on how the patentee used the claim term in the claims, specification, and prosecution history, rather than starting with a broad definition and whittling it down.

415 F.3d at 1321.  Of course, if no special meaning is apparent after reviewing the intrinsic evidence, claim construction might then "involve[] little more than the application of the widely accepted meaning of commonly understood words."  *Id.* at 1314.

6

dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1315.

### B.      The Specification

"The claims, of course, do not stand alone." *Id.* "Rather, they are part of a fully integrated written instrument, consisting principally of a specification that concludes with the claims." *Id.* (citations and quotation marks omitted). For that reason, the specification must always be consulted to determine a claim's intended meaning. The specification "is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

"In general, the scope and outer boundary of claims is set by the patentee's description of his invention." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1338 (Fed. Cir. 2006); *see also Phillips*, 415 F.3d at 1315-17 ("[T]he interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998))). "[T]he specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess." *Phillips*, 415 F.3d at 1316. It may also reveal "an intentional disclaimer, or disavowal, of claim scope by the inventor." *Id.* Therefore, the claims are to be construed in a way that makes them consistent with, and no broader than, the invention disclosed in the specification. *On Demand*, 442 F.3d at 1340 ("[C]laims cannot be of broader scope than the invention that is set forth in the specification."); *Phillips*, 415 F.3d at 1316 ("[C]laims must be construed so as to be consistent with the specification, of which they are a part." (quoting *Merck & Co. v. Teva Pharm. USA,*

*Inc.,* 347 F.3d 1367, 1371 (Fed. Cir. 2003))).

Nevertheless, courts must be careful to "us[e] the specification [only] to interpret the meaning of a claim" and not to "import[] limitations from the specification into the claim." *Id.* at 1323. A patent's "claims, not specification embodiments, define the scope of patent protection." *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1381 (Fed. Cir. 2009) ("[E]mbodiments appearing in the written description will not be used to limit claim language that has broader effect."). "In particular, [the Federal Circuit] ha[s] expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment." *Phillips*, 415 F.3d at 1323. This is "because persons of ordinary skill in the art rarely would confine their definitions of terms to the exact representations depicted in the embodiments." *Id.*

Although this distinction "can be a difficult one to apply in practice[,] . . . the line between construing terms and importing limitations can be discerned with reasonable certainty and predictability if the court's focus remains on understanding how a person of ordinary skill in the art would understand the claim terms." *Id.* "The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id.* at 1316 (quoting *Renishaw*, 158 F.3d at 1250).

### C.   The Prosecution History

After the specification and the claims themselves, the prosecution history is the next best indicator of term meaning. The prosecution history "consists of the complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent." *Id.* at 1317. "Like the specification, the prosecution history provides evidence of how

the PTO and the inventor understood the patent."  *Id.*  "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."  *Id.*  The doctrine of prosecution disclaimer applies equally to statements made during *inter partes* review proceedings before the Patent Trial and Appeal Board, to "ensure that claims are not argued one way to maintain their patentability and in a different way against accused infringers."  *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1360 (Fed. Cir. 2017).

However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes."  *Phillips*, 415 F.3d at 1316.  As a result, courts generally require that "a patent applicant . . . clearly and unambiguously express surrender of subject matter" to disavow claim scope during prosecution. *Voda v. Cordis Corp.*, 536 F.3d 1311, 1321 (Fed. Cir. 2008) (quoting *Sorensen v. Int'l Trade Comm'n*, 427 F.3d 1375, 1378-79 (Fed. Cir. 2005)); *see Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358 (Fed. Cir. 2016) ("[A] disclaimer or disavowel of claim scope must be clear and unmistakable, requiring words or expressions of manifest exclusion or restriction in the intrinsic record.").  Furthermore, "[p]rosecution history . . . cannot be used to limit the scope of a claim unless the applicant took a position before the PTO that would lead a competitor to believe that the applicant had disavowed coverage of the relevant subject matter."  *Schwing GmbH v. Putzmeister Aktiengesellschaft*, 305 F.3d 1318, 1324-25 (Fed. Cir. 2002).

### D.  **Extrinsic Sources**

Extrinsic evidence consists of "all evidence external to the patent and prosecution history,

including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)).  It "can help educate the court regarding the field of the invention and can help the court determine what a person of ordinary skill in the art would understand claim terms to mean." *Id.* at 1319.  However, extrinsic evidence suffers from a number of defects, including its independence from the patent, potential bias, and varying relevance.  *Id.* at 1318-19.  Such evidence is therefore "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence," and courts may consider, or reject, such evidence at their discretion.  *Id.* at 1319.

## III.   Analysis

There are nine groups of terms at issue in the '783 patent, which the Court will address in turn.

### A.   "Delimited by Outer Cannula Surface"

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "axis coaxial with and extending through a portion of said guide mechanism extends through a region delimited by the outer cannula surface" | Ordinary meaning or as construed by the Court in *Abiomed I* | As construed by the Court in *Abiomed I* with the additional limitation that "guide wire lumen is not attached outside the cannula" | 1 |

The Court construed an identical term as it was set forth in related patents in *Abiomed I* and concluded that its meaning was as follows:

> [T]he axis of at least a portion of the guide mechanism, "configured as a second lumen," must run through a region delimited by the outer cannula surface.  That construction includes configurations such as those depicted in Figures 8 and 9 of the '728 and '068 patents, and configurations such as those depicted in Gordon

> (which the Court sees no reason to distinguish from Figure 9).  It also includes configurations where the second lumen is coaxial with the cannula, such as "over-the-wire"-type designs.  It does not, however, include configurations such as those depicted in Bagaoisan.  The second lumen must be a separate structural element from the cannula itself, as the terms are listed separately.

*(Abiomed I* Mem. & Order on Claim Constr. at 41-42 (footnotes and citation omitted)).

Abiomed contends that the Court should adopt that construction with an additional limitation that "the guide wire lumen is not attached to the outside of the cannula."  It contends that the proposed construction clarifies that a structure disclosed in prior art is not encompassed by the claim language.

Maquet contends that the term should be construed according to its ordinary meaning, or, alternatively, according to the Court's order in *Abiomed I.*  Any additional limitation, according to Maquet, is unnecessary and unsupported by the specification and prosecution history.  Furthermore, Maquet contends that Abiomed should be judicially estopped from arguing for an additional limitation to the claim term because it admitted in *Abiomed I* that an "elongate lumen associated with the cannula" includes lumens that are "separate but permanently bolted on or attached to the side of the cannula."  (Docket No. 141 ("Maquet Opening *Markman* Br.") at 16).

The judicial estoppel argument may be disposed of quickly.  Judicial estoppel applies only if (1) "the estopping position and the estopped position [are] directly inconsistent" and (2) "the responsible party . . . succeeded in persuading a court to accept its prior position."  *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 33 (1st Cir. 2004).  It is not enough for a litigant to make a statement in prior litigation that is arguably inconsistent with its current position; the earlier statement must be directly inconsistent and must have been relied upon by the court in rendering its earlier decision.  At a minimum, Maquet cannot establish such

reliance here, and therefore judicial estoppel does not apply.

In any event, while the Court's claim construction in *Abiomed I* surely could have been more succinct, under the circumstances the Court sees no reason to depart from that construction here.  Accordingly, it will construe the term in the same manner as in *Abiomed I*, and without the additional language proposed by Abiomed.

### B.    "Guide Mechanism Comprising a Lumen"

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "guide mechanism comprising a lumen" | "guide mechanism comprising a lumen that does not extend through the free space between rotor blades" | "guide wire lumen does not extend through the free space between rotor blades" with the additional limitation "guidewire lumen is not distal to the cannula" | 1 |

The next term is best understood within the broader claim language, which reads as follows:

An intravascular blood pump system, comprising:

. . .

a guide mechanism comprising a lumen having a proximal end and a distal end, the guide mechanism adapted to guide a distal portion of said intravascular blood pump system to a predetermined location within a circulatory system of a patient.

('783 patent, App'x B col. 33 ll. 60-61 to col. 34 ll. 5-9).

In *Abiomed I*, the Court construed several terms concerning the lumen component of the guide mechanism individually, but construed all of them to "include the limitation that the guidewire lumen does not extend through the free space between the rotor blades." (*Abiomed I* Mem. & Order on Claim Constr. at 25).  Abiomed contends that the same limitation should be

12

applied here.  Maquet does not dispute the point, and therefore the Court will include that limitation here.

Abiomed further contends that an additional limitation is required that the guidewire lumen not be distal to the cannula.  According to Abiomed, Maquet acquiesced to an examiner's revision of claims 14 and 22 of the '238 patent, which resulted in a disclaimer of a lumen distal to the cannula in all related patents, including the '783 patent.

Maquet contends that no such disclaimer is apparent in the prosecution history of the '238 patent, nor is that history relevant here.  Maquet further argues that Abiomed should be judicially estopped from raising claim construction issues that could have been raised in *Abiomed I*.

To begin, the prosecution history of the '238 patent is relevant when determining the scope of the '783 patent, which is a descendant.  *See, e.g., Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1343 (Fed. Cir. 2015) ("A statement made during prosecution of related patents may be properly considered in construing a term common to those patents, regardless of whether the statement pre- or post-dates the issuance of the particular patent at issue.").

Furthermore, the doctrine of judicial estoppel is again inapplicable.  Maquet essentially argues that Abiomed should be estopped from making any argument that it could have raised in *Abiomed I*, but failed to do so.   Even putting to one side the question of whether Abiomed can be faulted for failing to object to claims in a patent that had not yet issued at the time of claim-construction proceeding in *Abiomed I*, it is clear that judicial estoppel does not apply where the court in the earlier matter was not even presented with the party's position, and therefore could not have relied upon it in reaching its decision.

The question, then, is whether Maquet made a disclaimer during the prosecution of the

13

'238 patent that necessarily limits its claims here.  During that prosecution, the examiner rejected claims 14 and 22 of the application (U.S. Patent App. No. 14/966,669) for failing to comply with the enablement requirement of 35 U.S.C. § 112.  (Docket No. 138, Ex. 9-C).  Those claims described the "entire elongate lumen" as being "distal to the intravascular blood pump," which was depicted in an embodiment that featured an "offset guidewire lumen" (that is, a "side-rigger" design).  (*Id.* at 3).  The examiner objected to the claim language because, in the examiner's opinion, the elongate lumen extended along the cannula, and because the intravascular blood pump comprised the cannula, the lumen could not accurately be described as "distal to the pump."  (*Id.*).  As a result, the examiner suggested that the claims be revised to describe the elongate lumen as being distal to the "rotor, first port or rotor shroud."  (*Id.*).  Maquet accepted that revision, and the claims were revised accordingly.

It appears that the examiner's objection stemmed primarily from a disagreement about the taxonomy of the intravascular blood pump (specifically, whether it included the cannula).  But the genesis of the objection is immaterial.  Maquet's acquiescence in the resulting changes amounts to a withdrawal of the broader claim, and that withdrawal is legally binding on it in a subsequent proceeding to prove infringement.  *See Rheox, Inc. v. Entact, Inc*., 276 F.3d 1319, 1325 (Fed. Cir. 2005) (arguments and amendments made during patent prosecution "can lead to narrow claim interpretations because 'the public has a right to rely on such definitive statements . . . .'") (alteration omitted) (quoting *Digital Biometrics, Inc. v. Identix, Inc.*, 149 F.3d 1335, 1347 (Fed. Cir. 1998)); *UCB, Inc., v. Yeda Research & Dev. Co.*, 837 F.3d 1256, 1261 (Fed. Cir. 2016) ("[T]he general rule is that a patent applicant cannot later obtain scope that was requested during prosecution, rejected by the Examiner, and then withdrawn by the applicant.").

Accordingly, the term "guide mechanism comprising a lumen" will be construed to

include the limitations that the guidewire lumen (1) "does not extend through the free space between the rotor blades" and (2) "is not distal to the cannula."

###   C.   "Guide Wire Does Not Pass Through the Rotor Hub"

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "guide mechanism is configured to allow a guidewire to slideably advance"<br><br>"guide wire does not pass through the rotor hub of the catheter" | Ordinary meaning | Ordinary meaning with the additional limitation "the guide wire does not extend through the free space in between the rotor blades" | 1, 24 |

As discussed, the Court in *Abiomed I* construed all lumen-related terms to include the limitation that the lumen could not extend through the space between the rotor blades, based on Maquet's disclaimer during the prosecution.  The Court addressed only in passing whether the same limitation applied to the guidewire itself:

> Maquet further contends that at most it disclaimed a *permanent* guide lumen that extended between the free space of the blades, not the use of a temporary one. (Maquet Reply Br. at 21-22).  But that is not a fair reading of the patent or the disclaimer.  While certain parts of the specification suggest that the guidewire can be removed prior to operation, ('437 patent, col. 12 l. 59-col. 13 l.2; *id.*, col. 14 ll. 44-49), nothing suggests that the guidewire lumen itself is removable.

(*Abiomed I* Mem. & Order on Claim Constr. at 25).

Here, Abiomed contends that Maquet, in distinguishing its blood pump from those portrayed in prior art, surrendered any claim to a pump that employed a guidewire extending through the space between the rotor blades.  That is made clear, according to Abiomed, by the specification of the '783 patent, which states that the guidewire may either remain in place or be removed once the blood pump is properly positioned within the patient.

In *Abiomed I*, the Court noted that during the prosecution history of earlier patents, Maquet distinguished its device from those that were rendered inoperable by a guide lumen extending between the rotor blades.  The prior art was Völker, which discloses a device that runs the guidewire between the rotor blades when being positioned within the circulatory system.  The relevant prosecution history discloses that the examiner distinguished Völker in part by noting that because Völker threaded the guidewire through the rotor blades and did not have a separate guide lumen, it did not teach or suggest side-rigger or coaxial guide mechanisms.  And Maquet adopted that position.  *See* Docket No. 138, Ex. 12-B at MAQ_00004994 ("Völker does not provide a separate second lumen for the guide mechanism.  Instead, Völker threads guidewire 25 through the pump housing, which temporarily prevents the rotor from turning . . . while the guidewire 25 is located in the pump housing, no Rotation of the impeller [is possible].  Therefore, Völker fails to teach or suggest the side rigger or coaxial guide mechanisms of claims 15, 29 or 45 [later issued as independent claims 1, 10 and 22].").  Abiomed contends that by adopting the examiner's position, Maquet disclaimed devices with a guidewire running between the blades.

A *permanent* guidewire that extended in the space between the rotor blades would render the pump inoperable; that much would be obvious to a lay person, never mind a person of skill in the art.  Völker did not claim such an invention, and Maquet does not claim it now.   Instead, Völker claimed a *removable* guidewire that extended in the space between the rotor blades.  The question is whether Maquet's adoption of the examiner's position distinguishing Völker resulted in a binding disclaimer of such a removable guidewire.

It is true that the specification of the '783 patent explicitly contemplates that the guidewire may be removed prior to operation of the pump.  (*See, e.g.,*'783 patent, col. 12 ll. 63-

66).  But that does not resolve the issue, as the guidewire may be removable in coaxial or side-rigger variations where the wire does not pass through the open space between the rotor blades.  Moreover, the specification indicates that removal of the guidewire is optional, suggesting that the specification does not contemplate any variation in which the wire passes between the rotor blades (because the pump would not function if the guidewire were not removed).  And nothing in the specification teaches the insertion of a guidewire between the rotor blades.

In any event, Maquet adopted the examiner's position, which distinguished Völker on the ground that it did not disclose a separate second lumen—that is, a lumen that is separate from the pump housing, whether coaxial or on the side.  It is difficult, under the circumstances, to construe Maquet's position distinguishing Völker as anything other than a surrender of the subject matter of a guidewire passing through the free space between the rotor blades in the pump housing.  Maquet thus disclaimed that subject matter during the prosecution, and the present claims should be construed accordingly.

Accordingly, the terms "guide mechanism is configured to allow a guidewire to slideably advance" and "guide wire does not pass through the rotor hub of the catheter" will be construed to include the limitation that "the guide wire does not extend through the free space in between the rotor blades."

D.     "**Establishes Slidable Contact with the Guide Mechanism**"

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "wherein the guide mechanism is configured such that the guide wire passes through the region delimited by the outer cannula surface at a location proximal to where the guide wire establishes slidable contact with the guide mechanism" | Ordinary meaning | Term fails for indefiniteness | 2 |

Section 112 of the Patent Act provides that "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the inventor or a joint inventor regards as the invention." 35 U.S.C. § 112(b).  A patent claim fails to satisfy that requirement and "is invalid for indefiniteness if its claims, read in the light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  That is, "a patent must be precise enough to afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Id.* at 909 (quotation marks and alterations omitted).  Nevertheless, "the definiteness requirement must take into account the inherent limitations of language," for "[s]ome modicum of uncertainty . . . is the 'price of ensuring the appropriate incentives for innovation.'" *Id.* (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 732 (2002)).

Claim indefiniteness is an issue of law to be decided by the court.  *Teva Pharms. USA, Inc.*, 789 F.3d at 1341.  To determine whether a claim is indefinite, a court "look[s] to the patent record—the claims, specification, and prosecution history—to ascertain if they convey to one of

skill in the art with reasonable certainty the scope of the invention claimed." *Id.* A patent is presumed to be valid. 35 U.S.C. § 282. Overcoming that presumption requires that a defendant prove indefiniteness by clear and convincing evidence. *Microsoft Corp. v i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011).

Abiomed contends that this term is indefinite because the language of the claim is incomprehensible and ambiguous. The claim describes two spaces or points through which the guidewire passes. The first is "the region delimited by the outer cannula surface"; the second is "where the guide wire establishes slidable contact with the guide mechanism." (Docket No. 143 ("Abiomed Opening *Markman* Br.") at 13-15). Abiomed contends that—aside from the requirement that the first point be proximal to the second—the claim fails to specify where those two points are located, thereby making the claim undefined, vague, and susceptible to multiple interpretations. (*Id.* at 14). Specifically, Abiomed contends that the claim language is unclear whether that first point—located in "the region delimited by the outer cannula surface"—lies within the cannula sidewall or within the cannula itself. (*Id.* at 15). In addition, there is no clear correlation, according to Abiomed, between the claim language and the embodiments specified in the patent, which depict both "side-rigger" and "over-the-wire" designs. (*Id.*).

Abiomed further contends that the second point—"where the guide wire establishes slidable contact with the guide mechanism"—is ambiguous, because the specification does not define what it means for the guide wire to "establish" slidable contact, nor does it define where within the guide mechanism that "contact" must take place. (*Id.* at 14). According to Abiomed, that ambiguity makes it unclear to which embodiments of the invention the claim corresponds.

Maquet contends that the language is clear to a person of ordinary skill in the art. With respect to a "region delimited by the outer cannula surface," Maquet argues that similar language

19

is set forth in claim 1, which Abiomed does not contest as ambiguous.  (Maquet Opening
*Markman* Br. at 30).  Similarly, Maquet asserts that the point "where the guide wire establishes
slidable contact with the guide mechanism" is the same point described in claim 1 where the
"guide mechanism is configured to allow for a guide wire to slideably advance therealong."  (*Id.*
at 30-31).  Moreover, Maquet cites to the testimony of Abiomed's expert witnesses, Dr. Antaki
and Dr. Collins, as evidence that the term is intelligible to a person of ordinary skill in the art.
(Docket No. 156 ("Maquet Reply *Markman* Br.") at 23-26).  Finally, the fact that the claim
language is broad and may encompass several different embodiments, Maquet argues, does not
render it indefinite.  (*Id.* at 24-25).

    The language is certainly difficult to parse, and Maquet has done little to elucidate its
meaning.  Nonetheless—and despite the fact that it appears to have a narrow meaning—
Abiomed has not met its burden of demonstrating that the language is fatally indefinite.

    The Court will begin its analysis with the second location ("where the guidewire
establishes slidable contact with the guide mechanism").  The patent, in simplified terms,
discloses a pump with a guidewire that slides through a lumen.  Maquet contends that the
location "where the guidewire establishes slidable contact with the guide mechanism" is "the
same location identified in claim 1, where the guide mechanism slidably advances along the
guidewire."  (Maquet Opening *Markman* Br. at 30-31).  That construction, however, cannot be
correct.  The claims use different terms ("establishes slidable contact" as opposed to "slidably
advances along"), which presumably have different meanings.  Furthermore, the term
"establishes" suggests that things are happening in a particular sequence:  (1) at the outset, the
guidewire does not have contact with the lumen; (2) the guidewire then "establishes" slidable
contact with the lumen: and (3) the guidewire then "slidably advances along" the lumen.  Put

another way, the term "establishes contact," in context, suggests the specific point at which the guidewire enters the lumen, not every point along the entire length of the lumen.

The first location ("the region delimited by the outer cannula surface") is perhaps more problematic, but again not fatally so. The Court discussed similar language in its claim construction opinion in *Abiomed I*, without resolving the issue presented here. (*See Abiomed I* Mem. & Order on Claim Constr. at 38).

As a general proposition, the "region delimited by the outer . . . surface" of a regularly shaped three-dimensional object is an unambiguous phrase. For example, even a lay person can readily grasp the meaning of that term when applied to a regularly shaped cylinder, sphere, or cone; the "region" in question is the interior of the cylinder, sphere, or cone. Here, the cannula is in the shape of a tube—essentially, an elongated cylinder. And, as a general matter, the "region delimited by the outer . . . surface" of a tubular object—like any other cylinder—is its interior.

How the second location is defined for an irregularly shaped object, and how the two locations relate to one another, is less than perfectly clear, and again Maquet has not provided much assistance in that regard. The most challenging aspect of the language is the requirement that the guidewire "pass[] through" the delineated "region" at a "location proximal to" the point where it "establishes slidable contact" with the lumen. That requires a design where the entry point for the guidewire into the lumen ("where the guidewire establishes slidable contact with the guide mechanism") must be distal (that is, farther away from the insertion site of the device into the body) than the "region delineated by the outer cannula surface." [2]

For the sake of illustration, consider an over-the-wire design. If the cannula were

---

[2] The parties do not dispute that "proximal" in the context of the patent means toward the insertion site of the device into the body.

perfectly cylindrical, in the shape of a cigarette, the "region delimited by the outer cannula surface" would be the interior of the cylinder.  The entry point for the guidewire ("where the guidewire establishes slidable contact with the guide mechanism") could not be the blunt end of the cylinder; that point would be neither proximal nor distal to the delimited "region."  If the ends of the cannula were tapered, in the shape of a cigar, again the entry point would be neither proximal nor distal to the delimited "region."  But if the end of the cannula were inwardly indented or tapered—like a cigarette with a recessed filter, or a cylindrical object with a tapered screw hole—part of the delimited region could arguably be proximal to the entry point.  In other words, the guidewire could conceivably pass through a region delimited by the outer surface of the cannula before establishing contact with the lumen.

If something is ambiguous, it can be reasonably construed in multiple ways, and if it is incomprehensible, it cannot be reasonably construed at all.  Here, it is possible (at least for the Court) to construe the language in at least one way that is comprehensible.  If there is another meaning to the language, Maquet has not supplied it—nor, for that matter, has Abiomed, which asserts that the claim is susceptible of multiple interpretations.  In any event, the Court has not been asked to construe the claim, only to determine whether it is fatally indefinite.  And while the claim language seems to be very narrow, a narrow claim is not the same as an ambiguous or indefinite claim.  Under the circumstances, therefore, Abiomed has not met its burden of showing that the term fails for indefiniteness.

E.    **"Proximate the Intravascular Blood Pump"**

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "Detect a pressure of blood proximate the intravascular blood pump" / "sense pressure proximate the intravascular blood pump" | Ordinary meaning | Term fails for indefiniteness | 3, 24 |

The Court addressed both of the disputed claim terms in *Abiomed I*, albeit in response to arguments that differ from those presented here.  There, Abiomed contended that, based on the prosecution history of the '100 patent, Maquet had limited the claim such that "proximate to the intravascular blood pump" meant "at the opening of the blood pump or cannula."  (*Abiomed I* Mem. & Order on Claim Construction at 67).  The Court determined that the prosecution history did not reveal such a limitation and therefore construed the terms according to their ordinary meaning.  (*Id.* at 67-68).  At that time, the Court did not address Abiomed's contentions that the terms were ambiguous, stating that Abiomed could raise arguments concerning indefiniteness at the appropriate time.  (*Id.*).

Abiomed now contends here that the terms are indefinite.  Specifically, it claims that nothing in the claim language, specification, or prosecution history informs a person of ordinary skill in the art of the meaning of "proximate"—that is, how close to the intravascular blood pump the "blood pressure detection mechanism" must be.  (Abiomed Opening *Markman* Br. at 16).  It further contends that the word "proximate" is a "term of degree," leaving the location of the blood pressure detection mechanism open to subjective interpretation.  (*Id.*)  The specification, according to Abiomed, does not provide any additional guidance, other than the language it incorporated from U.S. Patent Application No. 09/280,970, entitled "Pressure Sensing Cannula."

23

(*Id.* at 17).  Nevertheless, that application, according to Abiomed, concerned a different invention utilizing different blood-pressure sensing mechanisms, therefore making the application irrelevant to interpreting the terms of the '783 patent.  Nor does the prosecution history clarify the meaning of "proximate," as the IPR proceedings concerning this term did not result in a narrowing of claim scope.  (*Id.* at 17-18).  In support of its contentions, Abiomed points to Antaki's testimony, which states that the terms are ambiguous to a person of ordinary skill in the art.  (*Id.* at 17 (citing Antaki Decl. at ¶¶ 52-54)).

In response, Maquet contends that neither term requires additional construction and that the ordinary meaning suffices.  It contends that a person of ordinary skill in the art could reasonably determine the location of the blood pressure detection mechanism, given the claim language and the specification support found in the '970 application.  (Maquet Reply *Markman* Br. at 20-21).  According to Maquet, Antaki admitted as much in his testimony.  (*Id.* (citing Antaki Tr. at 121-25)).[3]

In many contexts, the term "proximate"—which is a term of degree that essentially means "near"—would be problematic.  *See, e.g., In re Neurografix Patent Litig.*, 201 F. Supp. 3d 206, 223 (D. Mass. 2016) (concluding that the term "near," in context, was indefinite, as it encompassed myriad possible configurations).  Nonetheless, a term of degree is not "inherently indefinite."  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1370 (Fed. Cir. 2014).  If there is sufficient intrinsic or other evidence such that a person of skill in the art could ascertain its meaning with reasonable certainty, it is not indefinite.  *Id.*

---

[3] Maquet further contends that Abiomed could have raised this argument in *Abiomed I*, and, consequently, should be estopped from making such arguments here.  (Maquet Opening *Markman* Br. at 30).  Again, the doctrine of judicial estoppel is inapplicable under the circumstances.

As for support in the specification, the '970 application describes pressure sensors incorporated into various parts of the cannula. (*See, e.g.*, '783 patent, App'x B at cols. 31-32 (appending the '970 patent)). Contrary to what Abiomed contends, that application is physically incorporated into the specification here, and therefore is intrinsic evidence as to the meaning of the term.

In any event, under the circumstances presented here, the term "proximate" is not fatally indefinite. The pump in question is designed to operate in a specific, highly confined environment, passing through the vasculature percutaneously and into the heart. Among other things, that operating environment substantially limits the possible configurations for the device. Furthermore, the only function of the device, which is to pump blood, intrinsically suggests that the pressure sensing device must be necessarily proximate to measure that pressure. A person of skill in the art could ascertain with reasonable certainty the limitations of the claim.

Accordingly, the terms "detect a pressure of blood proximate the intravascular blood pump" and "sense pressure proximate the intravascular blood pump" are not indefinite, and will be construed according to their ordinary meanings.

### F. Distal Tip Claims

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "pigtail-shaped distal tip" | Ordinary meaning | "thermoplastic rod formed into a loop attached at the distal end of the cannula" | 24 |
| "J-shaped distal tip" | Ordinary meaning | "J-tip guidewire" | 24 |

Abiomed contends that the claim term "pigtail-shaped distal tip" is vague and generic and that, as a result, the claim should be limited to the embodiments presented in the specification.

25

(Docket No. 155 ("Abiomed Reply *Markman* Br.") at 29-30). Specifically, the specification provides that "[t]he pigtail shape, illustrated in Fig. 30, can be formed by bonding or thermal welding or otherwise attaching a thermoplastic rod formed into a loop at the distal end of the cannula 1120." ('783 patent, App'x A at col. 26 ll. 41-44) (appending U.S. Patent No. 09/280,988)). Abiomed asserts that this description should govern the scope of the claim. (Abiomed Reply *Markman* Br. at 29).

Similarly, Abiomed contends that the claim term "J-shaped distal tip" is vague and generic such that it must be limited in scope to the relevant embodiment described in the specification. (Abiomed Reply *Markman* Br. at 31-33). The specification, according to Abiomed, does not describe a "distal tip"; rather, it describes a "J-tip" *guidewire* protruding from the distal end of the device. (*Id.* at 32). Abiomed contends that the term should be construed accordingly.

The Court agrees with Maquet that both terms are understandable to a person of ordinary skill in the art, and that no limitation from the specification should be read into the claims.[4] The terms "pigtail-shaped" and "J-shaped" are readily understandable, as is the term "distal." Nor is the term "tip" so vague that it must be limited to the distal end of the cannula, as opposed to the distal end of the guide wire or some other component. And there is certainly no reason to limit the claim to a particular type of material, such as a "thermoplastic rod."

Accordingly, the Court will construe the terms "pigtail-shaped tip" and "J-shaped distal tip" according to their ordinary meanings.

---

[4] Maquet again asserts that Abiomed had an opportunity to challenge these terms in *Abiomed I* and failed to do so. (*Id.*). Again, the Court will not apply judicial estoppel as a bar to Abiomed's arguments.

G.      __Claim 24__

Claim 24 describes, in relevant part,

An intravascular blood pump system comprising:

an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guidewire and configured to provide left-heart support, the intravascular blood pump comprising a rotor having a rotor hub tapering in a distal direction and a rotor shroud at least partially disposed about the rotor hub, at least one blade extending outward from the rotor hub extending distally beyond a most distal portion of the at least one blade;

. . .

a cannula coupled to a distal end of the intravascular blood pump, . . . the intravascular blood pump is configured to draw blood from the patient's heart into the at least one second port through the cannula and out the at least one first port to provide left-heart support while the cannula is positioned across an aortic valve of the patient, wherein the guidewire does not pass through the rotor hub or catheter;

a pigtail shaped distal tip or a J-shaped distal tip, wherein when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient . . . .

('783 patent, col. 37 l. 32 to col. 38 l. 9).

Abiomed contends that Claim 24 is indefinite on two grounds:  first, that the claim describes a function without specifying the structures needed to accomplish that function, (Abiomed Opening *Markman* Brief at 18-21), and second, that the claim impermissibly combines method and apparatus limitations (*Id.* at 21-23).  Each contention will be addressed in turn.

1. **"Adapted to be Guided to a Predetermined Location"**

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guide wire" | Ordinary meaning or "an intravascular blood pump adapted to be guided to a predetermined location within a circulatory system of a patient by a guide wire passing through a lumen of the intravascular blood pump" | Term fails for indefiniteness; alternatively, "an intravascular blood pump with either (a) a guide wire passing slideably through a side lumen formed along the side of the cannula, or (b) a conduit assembly, including a guide catheter, a rotor shroud, and a cannula, which is capable of docking to a separate pump assembly.  Both structures are for the guiding of the intravascular blood pump to a predetermined location." | 24 |

Abiomed first contends that the claim term is indefinite because it describes a blood pump that is "adapted" to be guided to a spot within the patient's circulatory system, but the claim does not describe a structure by which that adaptation is achieved—that is, the claim describes a device function, but fails to describe a structure that facilitates that function.  (*Id.* at 18).

In substance, Abiomed construes the opening language to be a "means" limitation, and thus seeks to import structural limitations from the specification into the claims.  That is not, however, an accurate interpretation of the language.  The challenged claim term is a non-limiting

preamble to the claim, and therefore provides context for the claim rather than a limitation.  *See*

*DeGeorge v. Bernier*, 768 F.2d 1318, 1322 (Fed. Cir. 1985) ("Comprising is often used after a

claim preamble to introduce elements of the invention.").  If the challenged claim language were

omitted from the claim altogether, the claim would still disclose a structurally complete device.

*See Arctic Cat Inc. v. GEP Power Prods., Inc.*, 919 F.3d 1320, 1328 (Fed. Cir. 2019) (stating that

"a preamble is not limiting where a patentee defines a structurally complete invention in the

claim body and uses the preamble only to state a purpose or intended use for the invention"

(internal quotations and citation omitted)).

Alternatively, Abiomed contends that if the Court is to construe the term, it should do so

in a manner that limits the claimed structures to those provided for in the specification—

specifically, structures that are characterized as "side-rigger" or "two-piece catheter" designs.

(Abiomed Opening *Markman* Brief at 20).  It contends that the "over-the-wire" design is not

encompassed by the claim terms because such a design is not described by the specification and

the claim limitation that "the guidewire does not pass through the rotor hub or catheter"

forecloses the possibility of an "over-the-wire" design.  (*Id.*).  In contrast, claims 26, 28, and 29

describe "side-rigger" designs, and claim 27 describes a "two-piece catheter" design.  (*Id.* at 21).

Claim 24 states that "the guidewire [cannot] pass through the rotor hub or catheter,"

which certainly would appear to foreclose any "over-the wire" design.  Abiomed acknowledges

that the language would permit either a "side-rigger" or "two-piece catheter" design.  And it has

failed to explain why other designs (if they exist) should be excluded from the claim language,

other than to argue that the limitations in the specification should simply be imported into the

claim, which is impermissible.

Accordingly, the Court will construe the term "an intravascular blood pump adapted to be

guided to a predetermined location within a circulatory system of a patient by a guide wire"

according to its ordinary meaning.

### 2.   <u>"When the Intravascular Blood Pump is Positioned"</u>

| Claim Term | Maquet's Proposed Construction | Abiomed's Proposed Construction | Claim No. |
|---|---|---|---|
| "when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient" | Ordinary meaning | Term fails for indefiniteness | 24 |

Claim 24 further recites, in part, the following:

An intravascular blood pump system, comprising:  [a pump with a guidewire; a catheter; a cannula;]

a pigtail shaped distal tip or a J-shaped distal tip, wherein when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient; and

[a pressure sensing element].

('783 patent, col. 37 l. 32 to col. 38 l. 10-14).

Abiomed contends that the claim term is indefinite according to the Federal Circuit's

decision in *IPXL Holdings, LLC v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005).  There,

the court determined that a claim reciting both a system for processing financial transactions and

a method for that system's use was indefinite because it was unclear whether infringement

occurred when the accused system was created or when the accused system was used in a

particular manner.  *Id.* at 1384.  Thus, the claim failed to "apprise a person of ordinary skill in

the art of its scope, and it [was] invalid under section 112, paragraph 2."  *Id.*

30

Here, Abiomed contends that claim 24 likewise describes both a system and method for intravascular blood pump.  Specifically, it contends that claim 24 purports to describe an intravascular blood pump system, but the claim language describes a method for that blood pump's use through the claim term "when the intravascular blood pump is positioned in the patient."  ('783 patent, col. 38 ll. 12-13).  That term, according to Abiomed, is not a limitation on the blood pump's structure, but rather a limitation on how the pump may be used.  (Abiomed Opening *Markman* Br. at 22).

The Court, however, does not construe the claim in that fashion.  Fairly read in context, the term specifies the capabilities of the claim structure and its orientation while in use rather than a method of use—that is, the claim permissibly describes the blood pump's function or capability without claiming a specific method for its use.  *See MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1313-16 (Fed. Cir. 2017).  Put another way, the claim language does not describe a task in which the pump is used; rather, the term describes the configuration and capability of the device when in the heart.

Accordingly, the term "when the intravascular blood pump is positioned in the patient to provide left-heart support the pigtail shaped distal tip or the J-shaped distal tip are wholly within a left ventricle of the patient" is not impermissibly indefinite, and will be construed according to its ordinary meaning.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated: September 12, 2022             Chief Judge, United States District Court