**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| MAQUET CARDIOVASCULAR LLC,    ) | |
| ) | |
| Plaintiff/Counterdefendant,    ) | |
| ) | Civil Action No. |
| v.                             ) | 17-12311-FDS |
| ) | |
| ABIOMED, INC., ABIOMED R&D, INC.,   ) | |
| and ABIOMED EUROPE GMBH,       ) | |
| ) | |
| Defendants/Counterclaimants   ) | |

**MEMORANDUM AND ORDER ON**
**MOTIONS TO EXCLUDE EXPERT TESTIMONY**

**SAYLOR, J.**

This is an action for patent infringement. It is the second lawsuit between the parties concerning a line of intravascular blood pumps. *See Abiomed, Inc. v. Maquet Cardiovascular LLC*, No. 16-cv-10914-FDS (D. Mass.) ("*Abiomed I*").[1] In this case, plaintiff Maquet Cardiovascular LLC has sued defendants Abiomed, Inc., Abiomed R&D, Inc., and Abiomed Europe GmbH for infringing U.S. Patent No. 10,238,783 (filed Sept. 21, 2018) ("the '783 patent"). Defendants (collectively, "Abiomed") have counterclaimed for declaratory judgment of noninfringement.

Before the Court are three motions to exclude expert opinions and testimony under Federal Rule of Evidence 702: Abiomed's motion to exclude the testimony of Boris Leschinsky, Maquet's technical expert (Dkt. No. 436); Abiomed's motion to exclude the testimony of James

---

[1] The underlying technology is described in the Court's memorandum and order on claim construction in this case. (Dkt. No. 248, at 2-4).

Malackowski, Maquet's damages expert (Dkt. No. 444); and Maquet's motion to exclude the testimony of John Bone, Abiomed's damages expert (Dkt. No. 423).  For the following reasons, Abiomed's motions to exclude the testimony of Leschinsky and Malackowski will be granted in part and denied in part, and the motion to exclude the testimony of Bone will be denied.

## I.      Legal Standard

### A.      Rule 702

The admission of expert testimony is generally governed by Rule 702 of the Federal Rules of Evidence.  The adoption of Rule 702 in its present form codified the standard of admissibility for expert testimony that was set forth in *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993).  *United States v. Diaz*, 300 F.3d 66, 73 (1st Cir. 2002).

Under Rule 702, district courts considering the admissibility of expert testimony must "act as gatekeepers, ensuring that an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.'"  *Samaan v. St. Joseph Hosp.*, 670 F.3d 21, 31 (1st Cir. 2012) (quoting *Daubert*, 509 U.S. at 597).  That gatekeeping function requires that the court consider three sets of issues:  (1) whether "the proposed expert is qualified by 'knowledge, skill, experience, training or education'"; (2) whether the subject matter of the proposed testimony "properly concerns 'scientific, technical, or other specialized knowledge'"; and (3) "whether the testimony [will be] helpful to the trier of fact, *i.e.*, whether it rests on a reliable foundation and is relevant to the facts of the case."  *Bogosian v. Mercedes-Benz of N. Am.*, 104 F.3d 472, 476 (1st Cir. 1997) (quoting Fed. R. Evid. 702).

The requirement that an expert's testimony must be based on a reliable foundation is often the "central focus of a *Daubert* inquiry."  *Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998).  In *Daubert*, the Supreme Court set forth a non-exhaustive list of factors that a court may consider in undertaking its reliability analysis:  (1) whether the theory or

2

technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether it has a known rate of error; (4) whether there are standards controlling its application or operation; and (5) whether it is generally accepted in the relevant community. *Daubert*, 509 U.S. at 593-94; *see also Samaan*, 670 F.3d at 31-32.

Less centrally, but importantly, Rule 702 requires the court to examine whether those methods have been reliably applied.  In other words, the court must "ensure that there is an adequate fit between the expert's methods and his conclusions."  *Samaan*, 670 F.3d at 32 (citing *Daubert*, 509 U.S. at 591).

In evaluating whether expert testimony will be helpful to the trier of fact, the court must determine whether it is relevant, "not only in the sense that all evidence must be relevant, but also in the incremental sense that the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue."  *Ruiz-Troche*, 161 F.3d at 81 (citations omitted); *see also Cipollone v. Yale Indus. Prods.*, 202 F.3d 376, 380 (1st Cir. 2000) ("The ultimate purpose of the *Daubert* inquiry is to determine whether the testimony of the expert would be helpful to the jury in resolving a fact in issue.").

The focus of the Rule 702 inquiry is on the principles and methodology employed by the expert, not the ultimate conclusions.  *Daubert*, 509 U.S. at 595.  The court may not subvert the role of the factfinder in assessing credibility or in weighing conflicting expert opinions.  Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Id.* at 596; *see also Ruiz-Troche*, 161 F.3d at 85 (admitting testimony notwithstanding a lack of peer-reviewed publications because the opinion rested upon good grounds generally and should be tested by the "adversary process").

3

Expert testimony that is admissible under Rule 702 may still be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusion of the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also Daubert*, 509 U.S. at 595. Thus, expert testimony that is relevant and passes muster from a scientific or technical standpoint may still be excluded if it is likely to be misinterpreted or misused by the jury.

**B.**   **Patent Apportionment**

The Federal Circuit has made clear that when "small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product." *LaserDynamics, Inc. v. Quanta Comput. Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012); *see also VirnetX Inc. v. Cisco Sys.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014). In such cases, there is an "evidentiary principle" that "the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). Acknowledging that risk, courts generally mandate "that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit'" ("SSPPU"). *LaserDynamics*, 694 F.3d at 67 (quoting *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287-88 (N.D.N.Y. 2009)). The narrow exception to that principle is the "entire market value rule" ("EMVR"), which allows a patentee to assess damages based on the entire product if they can show that the patented feature either "creates the basis for customer demand" or "substantially creates the value of the component parts." *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1312 (Fed. Cir. 2011) (citation modified). If a patentee cannot meet that burden, however, then "principles of apportionment apply," under which damages must be reduced to the contribution value of the

patented features.  *VirnetX*, 767 F.3d at 1326.

Furthermore, when "claims recite both conventional elements and unconventional elements, the court must determine how to account for the relative value of the patentee's invention in comparison to the value of the conventional elements recited in the claim, standing alone."  *Exmark Mfg. Co. v. Briggs & Stratton Power Prods. Grp.*, 879 F.3d 1332, 1348 (Fed. Cir. 2018) (quoting *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015)).  That does not require that "the value of all conventional elements must be subtracted from the value of the patented invention as a whole when assessing damages."  *AstraZeneca AB*, 782 F.3d at 1339.  Rather, "the question is how much new value is created by the novel combination, beyond the value conferred by the conventional elements alone."  *Id.*

That apportionment must be "grounded in the specific facts of the case."  *VirnetX*, 767 F.3d at 1331.  A failure to apportion appropriately is grounds for exclusion of expert testimony. *Id.*

## II.    Abiomed's Motion to Exclude Opinions and Testimony of Boris Leschinsky (Dkt. No. 436)

Abiomed seeks to preclude the testimony of Maquet's technical expert, Boris Leschinsky. He issued a technical report on July 25, 2025.  Among other things, the report provides a technical apportionment to determine what value of the accused products is attributable to the patented invention.  (Dkt. No. 487-1 ¶¶ 484-610).  He provides four alternative apportionment analyses.  In approach one, Leschinsky concludes that the combination of the patented features are responsible for "at least a majority" of the value of the accused products. [2]  In his third and

---

[2] Leschinsky appears to use the term "patented feature" to mean an aspect of the accused products that allegedly meets a limitation of the asserted claims.  For purposes of this motion, a "patented" or "claimed" feature will mean the same.  Conversely, a "non-patented" or "unclaimed" feature is an aspect of the accused products that is not a limitation of the asserted claims.

fourth approaches, he analyzes a list of patented and non-patented features in the accused products to conclude that the value of the patented invention could range from 47.73% to 68.94% of the overall value of the accused products.

Abiomed objects that Leschinsky provides no discernable methodology for his conclusion that the patented features comprise at least a majority of the value of the accused products. It seeks to exclude approach one and approach four, which incorporates that conclusion, on that basis. Abiomed also objects that approaches three and four attribute conventional components to the value of the patented invention. It seeks to exclude those approaches because Leschinsky failed to isolate the value of the patented improvement from the value of conventional components.

### A.    <u>Approach One</u>

In approach one, Leschinsky analyzes the importance of percutaneous insertion over a guidewire to the accused products' success. According to Leschinsky, intravascular blood pump systems can be delivered one of three ways: through a surgical cut down, open chest surgery, or percutaneous insertion over a guidewire. (Dkt. No. 487-1 ¶ 485). The first two methods require a surgeon. (*Id.* ¶¶ 487-88). Percutaneous insertion over a guidewire, on the other hand, may be performed by interventional cardiologists. (*Id.* ¶ 486). The development of percutaneous insertion therefore "redefined" a "market for mechanical circulatory support directed towards interventional cardiologists." (*Id.* ¶ 498).

He then provides specific support about the importance of percutaneous insertion to the accused products' success. For example, in statements to investors, Abiomed explained that the "paramount advantage" of the accused products was its implantation technique. (*Id.* ¶ 511). Abiomed's internal documents show that physicians described percutaneous insertion as a "show stopper" and a product without it would be a nonstarter. (*Id.* ¶ 504). Abiomed's Chief Technical

Officer also explained that "most cardiologists wouldn't touch anything if they couldn't use and apply a guide wire." (*Id.* ¶ 620). He also cites to evidence that an accused product vastly outperforms a similar unaccused Abiomed product that is inserted surgically. (*Id.* ¶ 631).

Leschinsky then analyzes the accused products. He concludes that, for each claim, it is the combination of the patented features that enables the accused products to be percutaneously inserted over a guidewire. For example, for claim 1, he opines that it is the combination of the patented guide mechanism (comprising a lumen), cannula, shroud, and rotor (having a rotor hub and blade), that enables percutaneous insertion. (*Id.* ¶¶ 500-01). The combination of the patented features provide "at least a majority" of the technical value of the accused products because of the importance of percutaneous insertion to the products' success. (*Id.* ¶ 519).

Abiomed asserts that Leschinsky's conclusion that "at least a majority" of the value of the accused products is attributable to the patented features is a "black box" with no "discernible methodology." (Dkt. No. 437, at 1-2). According to Abiomed, Leschinsky provided "no analysis" for his premise that percutaneous insertion over a guidewire accounts for the majority of the value of the accused products. (*Id.* at 10). It also contends that he failed to account for the value of other aspects of the accused products. (*Id.* at 11).

Abiomed overlooks Leschinsky's evidence about the critical role percutaneous insertion plays in the success of the accused products. This is not the case where an expert relies only on his "experience" to conclude that a patented feature is "extremely important." *NetFuel, Inc. v. Cisco Sys. Inc.*, 2020 WL 1274985, at *7 (N.D. Cal. Mar. 17, 2020). Nor is it the case where an expert applies a "rule-of-thumb" split that was "unjustified by evidence about the particular facts." *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1333 (Fed. Cir. 2014). Rather, Leschinsky grounds his conclusion in specific evidence about why the patented features drive the

success of the accused products in their target market.

Nor does Leschinsky ignore the value of non-patented features of the accused products. Rather, he analyzes the non-patented features and determines that they are not critical to percutaneous insertion.  (Dkt. No. 487-1 ¶¶ 542-55).  He then explains that, while these features may have some value, they do not "gatekeep[]" the market to cardiologistsp.  (*Id.* ¶ 556).  He also notes that products with the non-patented features but without the patented guidance mechanism have failed.  (*Id.* ¶¶ 548-49).  Any value attributable to these other features must therefore be less than the value of percutaneous insertion provided by the patented features.

In sum, Leschinsky's approach one is not a black box.  He sufficiently explains his reasoning and the particular facts on which it relies to enable vigorous cross-examination. Consequently, the Court will not exclude approach one on that ground.

### B.    Approaches Three and Four

In approaches three and four, Leschinsky incorporates the opinions of Abiomed's prior technical expert, Timothy Maher, and its prior damages expert, Gregory Leonard.  In *Abiomed I*, Maher created a list of fourteen "significant features" of the accused products.  (Dkt. No. 487-2 ¶ 227).[3]  He then individually analyzed the significance of each of the fourteen features.  (*Id.* ¶¶ 228-42).  He concluded that three features—the pump, rotor, and motor—were the "most important" features and together constituted "at least the majority" of what made the accused products feasible and usable.  (*Id.* ¶¶ 251).  Relying on Maher's technical apportionment, Leonard then allocated 50% of the value of the accused products to the pump, rotor, and motor, and divided the remaining 50% equally among the eleven other features.  (Dkt. No. 487-3

---

[3] Those features are the rotor, pump, motor, cannula, outflow cage, inflow cage, catheter, purge system, Automated Impella Controller, pigtail, guidewire and use of existing lumen, placement sensors, EasyGuide Lumen (for certain accused products), and introducer technologies and sheaths.  (Dkt. No. 487-2 ¶ 227).

¶ 123).  Leonard also performed an alternative apportionment that discounted the value of the "known aspects" of the guidewire and use of the lumen.  (*Id.* ¶ 124).

In approach three, Leschinsky also allocates 50% of the value of the accused products to the pump, rotor, and motor.  (Dkt. No. 487-1 ¶¶ 589-91).  He then divides that 50% equally between the three features.  In this case, the asserted claims recite the pump and rotor but not the motor.  (*Id.* ¶ 592).  He therefore attributes 33% of the overall value of the accused products (2/3 of 50%) to the claimed pump and rotor features.  (*Id.* ¶ 592).

Leschinsky then analyzes the eleven other features that comprise the remaining 50% of the value of the accused product.  He again divides that 50% equally between those features.  According to Leschinsky, claim 1 recites five of those eleven features.  (*Id.* ¶ 596).[4]  Giving the eleven features equal value, he attributes 22.73% of the overall value of the accused product (5/11 of 50%) to those five claimed features.  (*Id.*).  Together with the 33% from the claimed pump and motor, he concludes that 55.73% of the value of the accused products is attributable to the claimed features.  (*Id.*).

He also performs an alternative apportionment that discounts half the value of the claimed guidewire.  Under that apportionment, the claimed features comprise 53.79% of the value of the accused products (2/3 of 50% for the pump and rotor + 1/22 of 50% for the discounted guidewire + 4/11 of 50% for the remaining claimed features).  (Dkt. No. 487-1 ¶¶ 597-98).

In approach four, Leschinsky conducts a similar analysis incorporating his approach-one conclusion that the guidance features drive at least a majority of the value of the accused

---

[4] Leschinsky analyzes each of the asserted claims in approaches three and four.  For simplicity, the Court will use claim 1 to illustrate his methodology.

products.  (*Id.* ¶ 602).  Instead of allocating 50% of the value of the accused products to the rotor, shroud, and motor, Leschinsky allocates 50% of the value to the guidance features—the pigtail, guidewire and use of existing lumen, and the placement sensors.  (*Id.* ¶ 603).  Giving those three features equal value, he attributes 33% of the overall value of the accused products (2/3 of 50%) to the claimed pigtail and guidewire features.  (*Id.* ¶ 604).  He then divides the remaining value equally between the other eleven features.  Adding the value of those other five claimed features (5/11 of 50%) to the value of the claimed pigtail and guidewire features, he again concludes that 55.73% of the value of the accused products is attributable to the value of the claimed features.  Under the alternative apportionment discounting half the value of the guidewire, the claimed features comprise 47.73% of the value of the accused products (1/3 of 50% for the pigtail + 1/6 of 50% for the discounted guidewire + 5/11 of 50% for the remaining claimed features).  (Dkt. No. 487-1 ¶¶ 605-06).

Damages "must be based on the incremental value that the patented invention adds to the end product."  *Exmark Mfg. Co.*, 879 F.3d at 1348 (quoting *Ericsson*, 773 F.3d at 1226).  When an asserted claim recites both improved and conventional features, the patentee must apportion between the patented improvement and the conventional features.  *See id.*  Otherwise, the patentee would be compensated for the value of all claimed features rather than the value of the improvement.  *See id.* (explaining that holder of a patent claim directed at a lawn mower as a whole must apportion between the improved flow control baffle and the conventional features of a lawn mower).

Abiomed contends that approaches three and four fail to perform that required apportionment.  Here, the patented improvement relates to the intravascular blood pump's guidance features.  According to Leschinsky, that improvement enables minimally invasive

10

percutaneous insertion over a guidewire.  (Dkt. No. 487-1 ¶ 495).  In addition to the novel

guidance mechanism, the asserted claims recite conventional features such as the cannula,

shroud, and rotor.  Leschinsky admits that such features are, when considered in isolation,

conventional.  (*Id.* ¶ 512 ("[D]esigners of intravascular blood pumps commonly design and

manufacture cannulas . . . . "); *id.* ¶ 513 ("[P]ump designers are very experienced in modeling

and designing rotors as well as shrouds . . . to effectively pump blood without damaging the

cells.")).  Nonetheless, in approaches three and four, Leschinsky attributes the entire value of

these conventional features to the value of the patented invention—with the only exception the

discount for the guidewire.

Maquet responds that Leschinsky was not required to isolate the value of the invention

from the value of the conventional features.  When the patented improvement is a novel

combination of conventional elements, "removing the value of all of those elements would mean

that nothing would remain.  In such cases, the question is how much new value is created by the

novel combination, beyond the value conferred by the conventional elements alone."

*AstraZeneca AB*, 782 F.3d at 1339.  Maquet contends that Leschinsky properly evaluated the

value created by the novel combination of unconventional and conventional claimed elements.

As he concluded in approach one, it is the "combination of the patented features . . . that allow

the [a]ccused [p]roducts to be percuntaneously inserted over a guidewire."  (Dkt. No. 487-1

¶ 500).

Maquet's theory, however, does not match the methodology actually applied in

approaches three and four.  Feature counting is not a reliable method to evaluate the value of a

novel combination.  When the inventive aspect of a patent is a combination of conventional

components, then the value of the patented invention arises not from the mere presence of

discrete features but the way those features interact to create a new product. *See AstraZeneca AB*, 782 F.3d at 1340. Treating each part as an independent unit of value risks both undervaluing the invention, by ignoring synergies of the claimed combination, and overvaluing it, by attributing standalone value from conventional components to the patent merely because they appear in the claim. Put another way, the value of a combination does not equal the sum of its parts.

Yet approaches three and four use feature counting to evaluate the value of a combination. In *Abiomed I*, Maher developed a list of fourteen significant features based on their individual value. Here, Leschinsky adds up the individual value of the claimed features to evaluate the total value of the combination of those features. But there is no discernible relationship between the individual value of a feature and its combination value. The value of the patented invention does not equal the sum of the claimed features.

Looking at a single feature illustrates the problem. In *Abiomed I*, Maher concludes that the rotor "heavily influences the flow rate" and contributes to the accused products' safe use, small size, and ease of use. (Dkt. No. 487-2 ¶¶ 228, 247). The rotor was therefore one of the most important features individually and, together with the pump and motor, comprised at least the majority of what made the accused products "feasible and usable." (*Id.* ¶ 251). In approach three, Leschinsky adopts Maher's conclusion and attributes 16.67% (1/3 of 50%) of the overall value of the accused products to the rotor. Yet the reason Maher included the rotor on his list of significant features is its contribution to the accused products' flow rate, safe use, small size, and ease of use. The basis for that 16.67% value is therefore the rotor's conventional value. The basis is not the patented invention—that is, improved guidance features that enable percutaneous insertion over a guidewire. By following Maher and Leonard's framework, Leschinsky

12

misattributes the conventional value of the rotor to the value of the invention.

Approach four fares no better. There, Leschinsky attributes 50% of the value of accused products to the pigtail, guidewire and use of existing lumen, and placement sensors because he considers those the most important features to enabling percutaneous insertion over a guidewire. (*Id.* ¶ 223). Because Leschinsky weighs the importance of guidance features more heavily in this approach, the value of the patented invention should seemingly be higher than in approach three. Instead, the value is the same: 55.73% of the accused products. When applying the guidewire discount, the value is actually lower in approach four than it is in approach three: 47.73% versus 53.79%. The fact that approach four reaches a similar or lower value despite weighing the inventive aspect of the patent significantly higher illustrates that the methodology is not an apportionment of the value of the patented invention—it is merely counting up claimed features.

Maquet contends that Leschinsky directly derived his approach from Maher and Leonard and therefore he "credit[ed] conventional elements to the same extent Abiomed did." (Dkt. No. 486, at 15). As noted above, there are substantive differences between Maher and Leonard's technical apportionment and Leschinsky's technical apportionment. Moreover, Maquet did not challenge the admissibility of the Maher and Leonard's reports in *Abiomed I*, and thus this is the first time the Court has addressed that methodology. Maquet has not cited any authority for the proposition that an unreliable methodology should be presented to the jury in this case because the opposing party relied upon a similar methodology in a different case.

In sum, Maquet contends that the patented invention is the combination of claimed features that enables percutaneous insertion. Approaches three and four apportion the value of individual features, not the value of that inventive combination. Those approaches therefore do not apportion between the patented invention and conventional claimed features and will be

excluded on that basis.

### III.    Abiomed's Motion to Exclude Opinions and Testimony of James E. Malackowski (Dkt. No. 444)

Abiomed has also moved to exclude certain opinions of James E. Malackowski, Maquet's damages expert.  Specifically, it seeks to exclude Malackowski's opinions that rely on Leschinsky's technical apportionment in approaches three and four, opinions concerning the entire market value rule, and opinions concerning damages for convoyed sales.

#### A.    Reliance on Leschinsky's Approaches Three and Four

Abiomed contends that if the Court finds that Leschinsky's technical apportionment in approaches three and four unreliable, it should exclude Malachowski's opinions that rely on that apportionment.

Maquet contends, however, that Abiomed's request for exclusion is overbroad.  Abiomed seeks to exclude, among others, § 15.13.2 of Malackowski's report along with its associated schedule.  In that section, Malackowski uses three frameworks to apportion Abiomed's contributions to the accused products:  (1) an empirical comparison between the accused product and a similar, unaccused product; (2) a technical apportionment that replicates Leschinsky's approach three; and (3) and a technical apportionment that directly relies on Leschinsky's approach four.  (Dkt. No. 447-4, at 96-98).  He considers all three frameworks and chooses the lowest figure—47.73% of the value of the claimed invention—derived from Leschinsky's approach-four technical apportionment.

The first framework does not produce a technical apportionment percentage, and therefore may be of limited use for damages calculations.  However, it does not rely on Leschinsky's technical apportionment and therefore is not excludable for that reason.  The second and third frameworks either replicate or directly rely on Leschinsky's approaches three

14

and four.  As noted, those approaches do not properly apportion the value of the patented invention.  The Court will therefore exclude the portions of Malackowski's testimony that replicate or rely on those approaches.

### B.  Entire Market Value Rule

Next, Abiomed moves to exclude Malackowski's fallback theory that the entire market value rule applies and Maquet is entitled to the entire value of the accused products.

The entire market value rule is a limited exception to the apportionment requirement.  It "allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'"  *Uniloc USA*, 632 F.3d at 1318 (quoting *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed.Cir.2009)).  For the rule to apply, the patentee must prove "that its patented technology drove demand for the entire product."  *VirnetX*, 767 F.3d at 1329.

When the "accused product has other valuable features beyond the patented feature, the patent holder must establish that these features do not cause consumers to purchase the product."  *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 979 (Fed. Cir. 2018).  It "may do this by showing that the patented feature 'alone motivates customers to purchase the infringing product.'"  *Id.* (alteration omitted) (quoting *LaserDynamics*, 694 F.3d at 69).  Put another way, it is not enough for the patentee to prove that "if given a choice between two otherwise equivalent [products], only one of which practices [the patented feature], . . . consumers would choose the [product] having the [patented feature]."  *LaserDynamics*, 694 F.3d at 68.  Rather, the patentee must show that the patented feature "is what motivates consumers to buy [the product] in the first place."  *Id.*

Abiomed contends that Malackowski provided no analysis to support his conclusion that

15

the patented features drove customer demand for the accused products.  To the contrary, his conclusion rests on evidence that non-surgical consumers would not buy an intravascular blood pump system in the first place were it not for the patented feature.  As noted, Leschinsky opined that the combination of the patented features enables percutaneous insertion over a guidewire and that interventional cardiologists cannot use other insertion techniques.  Malackowski relies on the opinions of Maquet's technical experts that the patented features "redefined the market for mechanical circulatory support" and that "there would be no market" for the accused products in the cardiology community without the patented features.  (Dkt. No. 447-4, at 54).  Abiomed does not dispute that that is the relevant market for the accused products.  He also considers Abiomed's marketing materials, the testimony of key employees, the commercial failure of a nonaccused Impella device that contained the purportedly valuable internal motor, and that the nonaccused Impella LD comprises only 1.1% of the total unit sales of the accused Impella products.  (Dkt. No. 447-4, at 34-37 and 96-98).  That evidence supports his conclusion that percutaneous insertion drives consumers to purchase the accused products.

To be sure, his reasoning is not airtight.  Abiomed raises evidence that other features are more important to cardiologists than ease of insertion and that some cardiologists may not even use the guidewire.  These are factual disputes for the jury, however.  Malackowski's conclusion that that patented features drive demand for the accused products in the relevant market has sufficient evidentiary support.  Abiomed may challenge the weight of that evidence on cross-examination.

Abiomed also contends that even if percutaneous insertion drives demand for the accused products, Malakowski has not established that the patented features are alone responsible for percutaneous insertion.  It maintains that it is undisputed that non-patented features of the

accused products also contribute to percutaneous insertion.  However, Leschinsky does opine that the non-patented features do not, standing alone, contribute to percutaneous insertion.  (Dkt. No. 487-1 ¶¶ 542-56).  The fact that non-patented features may improve the ease of percutaneous insertion does not refute Malakowski's conclusion that the combination of patented features is what makes percutaneous insertion possible—and it is that capability that opens the market to cardiologists.  Whether Abiomed's improvements to the patented features are what really makes percutaneous insertion commercially viable is a question of fact for the jury.

### C.    <u>Convoyed Sales</u>

Abiomed also seeks to exclude Malackowski's opinions concerning convoyed sales. Malackowski opines that Maquet is entitled to revenue generated by certain non-patented products Abiomed sells that are associated with the accused products.  These "convoyed sales" include "consoles, services, rentals for those consoles, and other accessories, which include guide wires and purge cassettes."  (Dkt. No. 496-1, at 58).

"A 'convoyed sale' refers to the relationship between the sale of a patented product and a functionally associated non-patented product." *American Seating Co. v. USSC Grp., Inc.*, 514 F.3d 1262, 1268 (Fed. Cir. 2008).  A patentee may recover lost profits for the related non-patented product if the patented and non-patented product "together were considered to be components of a single assembly or parts of a complete machine, or they together constituted a functional unit." *Id.* (quoting *Rite-Hite Corp. v. Kelley Co. Inc.,* 56 F.3d 1538, 1550 (Fed.Cir.1998)).

Abiomed contends that the relationship between a patented and non-patented product is functional only if the non-patented product would be "useless" without the patented product. (Dkt. No. 445, at 15).  That is, the relationship is nonfunctional if the non-patented product has an independent use.  According to Abiomed, the alleged convoyed products cannot be a

"functional unit" with the accused products because they can also be used with nonaccused Abiomed products.

The case law does not support such a brightline rule, however.  In *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, the Federal Circuit explained that a "use independent of the patented device . . . *suggests* a non-functional relationship."  778 F.3d 1365, 1375 (Fed. Cir. 2015) (emphasis added), *vacated on other grounds*, 577 U.S. 1099 (2016).  Other Federal Circuit cases show, however, that an independent use does not necessitate a non-functional relationship.  For example, in *Juicy Whip, Inc. v. Orange Bang, Inc.*, the Federal Circuit held that the district court erred in finding that non-patented beverage syrup concentrate had no functional relationship with the patented juice dispenser.  382 F.3d 1367, 1371-72 (Fed. Cir. 2004).  The syrup and dispenser were "in fact analogous to parts of a single assembly or a complete machine," *id.* at 1372, even though "the two items [were] capable of use independently of each other," *id.* at 1371.  Thus, convoyed sales cannot be excluded solely on the grounds that convoyed items may be used with unaccused Abiomed products.

In its reply, Abiomed contends that the "critical question" is whether the non-patented products have a functional relationship to the patented invention (that is, guidance features for inserting a blood pump into a patient's heart), rather than to the patented product generally (that is, an intravascular blood pump system).  (Dkt. No. 511, at 8).  It maintains that at least some of the convoyed items relate to the unclaimed motor and therefore have no functional relationship to the improved guidance features.  That is a different argument from the one raised in its opening brief and therefore is not properly before the Court.  *See Smith v. Liberty Mut. Ins. Co.*, 2021 WL 1581017, at *3 (D. Mass. Apr. 22, 2021) ("[W]hen a moving party raises an argument

for the first time in a reply brief, that argument is waived." (citation modified)).[5]  The Court will therefore deny Abiomed's motion to exclude Malackowski's testimony regarding convoyed sales.

**IV.    Maquet's Motion to Exclude Mr. Bone's Opinions and Testimony (Dkt. No 423)**

Maquet has moved to exclude the opinions and testimony of John Bone, an expert witness retained by Abiomed to provide rebuttal testimony on apportionment and damages. Bone's opinions on apportionment are based primarily on a survey of interventional cardiologists Abiomed conducted in 2017 in the regular course of its business.  (Dkt. No. 424, at 3).[6]  Based on that survey, Bone calculated the relative importance of the features that allegedly infringed the '783 Patent, and used that calculation to estimate the percentage of profit earned by Abiomed attributable to the allegedly infringing features, reaching a significantly lower estimate than Maquet's apportionment expert, Boris Leschinsky.  Maquet seeks to exclude the portions of Bone's report that rely on that survey to construct his own apportionment estimate.

As an initial matter, Abiomed's contention that the testimony of a rebuttal expert should be subject to less-searching review under *Daubert* and Rule 702 finds no support in the case law. Rather, the law is clear that "rebuttal experts must still meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology,

---

[5] In its opening brief, Abiomed explained that "a patentee must prove that the unpatented products and the *patented product* together constitute a 'functional unit.'"  (Dkt. No. 445, at 14 (emphasis added) (quoting *Wash World Inc. v. Belanger Inc.*, 131 F.4th 1360, 1375 (Fed. Cir. 2025)).  Abiomed then adopted a new rule statement. In its reply, it explained that a non-patented product must have a "functional relationship to the *patented invention*." (Dkt. No. 511, at 7 (emphasis in original, bolding omitted) (quoting *Wash World Inc. v. Belanger Inc.*, 131 F.4th 1360, 1375 (Fed. Cir. 2025)).  That critical language—"to the patented invention"—does not appear in the convoyed sales section of its opening brief.

[6] Bone also used the results of a 2011 survey commissioned by Abiomed to serve as a "reasonableness check" on his calculations derived from the 2017 survey.  (Dkt. No. 425-2 ¶ 307).  Because the bulk of his opinion focuses on the 2017 survey and his analysis thereof, the Court similarly focuses on the issues raised by reliance on the 2017 survey.

and relevance of the testimony." *Capri Sun GmbH v. American Beverage Corp.*, 595 F. Supp. 3d 83, 139 (S.D.N.Y. 2022) (citation modified) (quoting *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016)); *see also Clark v. Edison*, 881 F. Supp. 2d 192, 211-15 (D. Mass. 2012) (evaluating admissibility of rebuttal testimony under Rule 702); *Aviva Sports, Inc. v. Fingerhut Direct Marketing, Inc.*, 829 F. Supp. 2d 802, 834-35 (D. Minn. 2011) (same).

A rebuttal expert need not offer a competing analysis; instead, he may simply critique the analysis of an affirmative expert, as Bone does extensively in his report. *See In re Aluminum Warehousing Antitrust Litig.*, 336 F.R.D. 5, 29 (S.D.N.Y. 2020) ("There is no requirement that a rebuttal expert himself offer a competing analysis; his opinions may properly concern criticizing that presented by another party." (quoting *Luitpold Pharms., Inc. v. ED. Geistlich Sohne A.G.*, 2015 WL 5459662, at *12 (S.D.N.Y. Sep. 16, 2015))).  But where a rebuttal expert does seek to offer an independent analysis as part of that critique, that opinion must be evaluated for reliability in the same manner as any other.  *See Capri Sun GmbH*, 595 F. Supp. 3d at 138-39. Accordingly, Bone's testimony must be evaluated according to the same standards applicable to all expert witnesses.

Maquet's argument to exclude Bone rests almost entirely on an opinion from the Northern District of Texas excluding Bone's testimony in another patent case.  *See HOYA Corp. v. Alcon, Inc.*, 2024 WL 6868536, at *3-5 (N.D. Tex. Jan. 29, 2024).  In that case, Bone offered an apportionment opinion based on a survey that "assesse[d] the relative importance of thirteen attributes of a hypothetical device and whether such attributes [were] of 'above average' or 'below average' importance." *Id.* at *4.  From that data, the survey "scale[d] the 'importance score' results to add up to 100%." *Id.*  Bone then identified seven of the thirteen features as being "closely related to the patents-in-suit" based on conversations with another expert witness

20

and "summ[ed] the percentages associated with those seven attributes to reach his 56% apportionment factor." *Id.*

The court found that Bone's analysis was "problematic in multiple ways." *Id.*  First, the court noted that the expert based on whose understanding Bone identified the relevant attributes had never reviewed the survey in question. *Id.*  As a result, the court found that there was "no technical basis for Mr. Bone to conclude that the seven attributes he identifies are, in fact, closely related to the asserted patents, let alone that these attributes reflect the inventive contributions described therein." *Id.*  More fundamentally, the court found that there was "no economic or technical basis for Mr. Bone to assume that the relative 'importance scores' assigned to those attributes by survey respondents correspond to the proportion of value of the" allegedly infringing product. *Id.* at *5.  This was both because the survey was based on a hypothetical device, with no analysis confirming that the attributes analyzed were present in the product, and because the court found there was no connection between the "scaled relative importance score"—that is, how important practitioners thought various components of a hypothetical product were—and the value that was "attributable to inventive features of the asserted patents." *Id.*

Bone's analysis here, though, is more closely tied to the facts of the case.  Unlike in *HOYA*, where there was "no technical basis for Mr. Bone to conclude that" the attributes he identified were "closely related to the asserted patents," here Bone had a basis for his assumption that the central advancement of the '783 patent was the guide mechanism.  In his report, Bone stated that he understood from Dr. Dasi "that the inventive element of the '783 patent relates only to the specified guidance features." (Dkt. No. 425-2 ¶ 101).  Dr. Dasi confirmed this conversation in his deposition. (Dkt. No. 474-9, at 247, 251).  And evidence from Maquet

21

confirms this understanding as well.  One of Maquet's experts also testified that the "benefit of the invention" in the patent "relate[d] to ease of placement."  (Dkt. No. 474-4, at 285).  And the abstract of the '783 patent confirms this as well:  it describes the invention as "[a]n improved intravascular blood pump and related methods involving the broad inventive concept of equipping the intravascular blood pump with guiding features such that the intravascular blood pump can be selectively positioned at a predetermined location within the circulatory system of a patient."  '783 patent ¶ 57, at 1.  For those reasons, Bone provides reasonable support for his assumption that the "ease of placement" attribute in the 2017 survey encompasses the inventive contribution of the '783 patent.

Furthermore, Bone's analysis was reliably connected to the allegedly infringing products. Maquet points out that the survey question on which Bone relies asked about a hypothetical "cardiac device," rather than Abiomed's products in particular.  (Dkt. No. 424, at 15).  But other parts of the survey clearly referred to the Impella, including a question asking whether the Impella performed "very well," "somewhat well," "not very well," or "not at all well" on each of the relevant attributes.  (Dkt. No. 425-10, at 4).[7]  And, on all attributes, more than 50% of respondents rated the Impella as performing "very well" or "somewhat well," strongly suggesting that all these attributes were in fact present.  (*Id.*).  Finally, to the extent Maquet faults Bone for failing to consider additional attributes not captured in the survey, including them would have resulted in a lower apportionment percentage—so the omission actually works in Maquet's favor.

--------

[7] Maquet argues that these other slides in the presentation cannot be considered because Bone did not specifically reference them in his report.  (Dkt. No. 514, at 5).  But the title of the presentation—"Impella Reputation and Market Assessment"—makes the context of its preparation clear, and the greater context of the report makes clear that Bone reviewed the entirety of the presentation in conducting his analysis.  (*See* Dkt. No. 425-2 ¶ 304).

This is not to say that Bone's analysis appears unassailable.  It is unclear, for example, whether the proportion of users of a product that rate a particular feature as being "important" necessarily ought to correspond with the percent of the product's value attributable to that feature.  Nearly all respondents, for instance, would likely say that the presence of wheels on an automobile is "very important" to its functioning, but that does not necessarily mean that the wheels are responsible for an outsized share of the automobile's value.  Furthermore, it is unclear why the percentage of respondents who rated a feature as "very important" is the appropriate object for analysis, rather than those who rated it "somewhat" important as well.  But these issues can be investigated effectively on cross-examination and do not, on their own, provide a reason to exclude Bone's opinions.  *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

For those reasons, Maquet's motion to exclude the opinions and testimony of John Bone will be denied.

## V.    Conclusion

For the foregoing reasons, Abiomed's motion to exclude the opinions and testimony of Leschinsky is GRANTED in part and DENIED in part; Abiomed's motion to exclude the opinions and testimony of Malackowski is GRANTED in part and DENIED in part; and the motion to exclude the testimony of Bone is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Dated:  May 12, 2026                    United States District Judge

23